# EXHIBIT A

2025 WL 919195
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

CASEY E. HALL-LANDERS, Plaintiff,
v.
NEW YORK UNIVERSITY, Defendant.

20 Civ. 03250 (GBD) (SLC)
|
Filed 03/26/2025

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS United States District Judge

*1 Plaintiff Casey E. Hall-Landers brings this action against Defendant New York University ("NYU"), seeking to hold NYU liable on theories of breach of implied contract, unjust enrichment, and money had and received. (Second Am. Compl. ("SAC"), ECF No. 66.) Hall-Landers now moves for class certification and appointments of class representative and class counsel. (Mot. to Certify Class ("Class Mot."), ECF No. 117.) NYU opposes. (Mem. of L. in Opp. re Mot. to Certify Class ("Opp."), ECF No. 134.)

Before this Court is Magistrate Judge Sarah Cave's December 6, 2024 Report and Recommendations (the "Report"), recommending that the Class Motion be denied. (Report, ECF No. 186.) Both parties filed timely objections to only certain portions of the Report. (*See* Plaintiff's Objection to Report and Recommendations ("Pl. Obj."), ECF No. 191; Defendant's Objection to Report and Recommendations ("Def. Obj."), ECF No. 192.) This Court undertakes a *de novo* review of the portions of the Report to which either party objected and a clear error review of the portions to which no party objected. After doing so, this Court ADOPTS Judge Cave's Report in full.

I. FACTUAL BACKGROUND [1]

[1] The procedural and factual background is set forth in greater detail in the Report and is incorporated by reference herein.

A. Hall-Landers and NYU

Hall-Landers is a graduate of NYU's Tisch School of Arts, majoring in dance and attending through Spring 2020. (Report at 2.) Before enrollment, Hall-Landers was told by campus representatives at various pre-enrollment events about in-person and on-campus resources that would be available. (*Id.* at 2–3.) During the Spring 2020 semester, Hall-Landers took seven in-person classes at NYU. (Report at 3.) The tuition paid was approximately $27,964, as well as various amounts in fees that were "directly and proximately related to on-campus resources provided at NYU." (SAC ¶ 20.)

NYU is a nonprofit educational institution that, in Spring 2020, "had ten distinct undergraduate schools at its New York campuses, which offered nearly 5,000 undergraduate courses across more than 230 areas of study." (Decl. of William Clay ("Shirky Decl."), ECF No. 146 ¶ 4.) NYU and each of these schools disseminate a wide variety of marketing materials to prospective students that promote the "activities, services and opportunities" that are available both at NYU generally and within certain colleges, schools, or programs. (Decl. of Martin S. Dorph ("Dorph Decl."), ECF No. 148 ¶ 4; *see* Report at 5.) The content of these materials may vary depending on the program or school the prospective students applied to. (*See* Dorph Decl. ¶¶ 4–8; Report at 5.) NYU also offered online degree programs for both undergraduates and graduate students before the Spring 2020 semester. (Report at 6.)

Each year, NYU sets its tuition rates by considering its general operating budget and any other sources of revenue it anticipates having. (*Id.* at 5.) NYU does not consider the "modality of instruction"—that is, whether instruction is in-person, online, or hybrid—when it sets tuition rates. (*Id.* at 5–6.) Each student's rate of tuition and fees is determined by the "the particular college, school, and/or program in which they are enrolled, as well as the number of credits they take in a given semester." (Decl. of Anthony Bonano ("Bonano Decl."), ECF No. 149, ¶ 6; Report at 6.) At most schools, tuition is a flat rate for students who enroll in 12–18 credits. (Report at 6–7.) Regardless of school or program, students choose and register for classes via the Albert Portal, which displays information regarding each class—including the "Instruction Mode" (in-person, virtual, hybrid, and so on.) (*Id.* at 7.) Thus, in any given semester, students may choose a class schedule that includes both in-person and online classes. (*Id.* at 8.) Such was the case at the beginning of Spring 2020. (*Id.*)

B. Spring 2020 Shift to Online Instruction

**\*2** In March 2020, in response to the COVID-19 pandemic and related legal regulations, NYU transitioned to fully remote courses and examinations for the Spring 2020 semester. (*Id.* at 8.) NYU also closed its libraries, sports facilities, and other venues. (*Id.* at 9.) The university issued pro-rated housing refunds for students who had vacated student housing, as well as automatic refunds for more than 25 school- and course-based fees. (*Id.* at 8–9.) With respect to tuition refunds, students were directed to "petition the particular school in which they were enrolled to refund their individual tuition based on the student's particular extenuating circumstances[,]" and each "school[ ] had discretion to issue such refunds if [it] found a refund warranted under the circumstances." (Bonano Decl. ¶ 8.). [2]

[2] This information was also posted online. (*See* Report at 10.)

NYU cancelled seven courses because they could not be effectively taught remotely; students in those courses received refunds unless their remaining number of credits still subjected them to the same flat rate of tuition. (Report at 10.) Otherwise, courses that transitioned to remote instruction were taught by the same instructors who had previously taught the courses in person. (*Id.*) NYU also provided other remote services and resources to students, including accommodations for those with certain ability impairments, academic advising and career counseling, medical and counseling appointments, research and library services, athletics resources, and technological support. (*Id.* at 11.)

After this transition to remote courses, Hall-Landers largely completed the Spring 2020 semester remotely from San Diego. (*Id.* at 12.) Hall-Landers did not otherwise use extracurricular services or resources that NYU offered. (*Id.* at 12–13.) Hall-Landers also did not request or receive a refund for Spring 2020 tuition. (*Id.* at 12.) According to NYU's records, Hall-Landers paid "$27,964.00 in tuition, $6,694.00 for housing, $2,568.00 for a meal plan, a $185 Production Fee, a $77 Liability Insurance Fee, a $1,312.00 Tisch Undergraduate Registration and Services Fee, and $2,405.00 for health insurance" for the Spring 2020 semester, totaling $41,205.00. (*Id.*; Bonano Decl. ¶ 11.) NYU records reflect that the university refunded the cost of housing by $3,347.00, the meal plan by $1,306.14, the Production Fee by $92.50, and the Liability Insurance Fee by $38.50, resulting in a total refunded amount of $4,784.14. (Bonano Decl. ¶ 11.) This amount conflicts with Hall-Landers's accounts, but both parties agree that Hall-Landers received a refund totaling at least $4,653.14. (Report at 12 n.4.) In addition, NYU's records show that Hall-Landers's father, Scott A. Landers, paid Hall-Landers's tuition and fees for the Spring 2020 semester. (*Id.* at 12.)

**C. Class Certification**

Hall-Landers seeks certification of the following class: "All undergraduate students enrolled in classes at New York University at one of NYU's New York campuses during the Spring 2020 semester who paid tuition" (the "Proposed Class"). (Class Mot. at 1.) Plaintiff also seeks appointment as class representative for the Proposed Class, and the appointment of Bursor & Fisher, PA. as class counsel. (*Id.*)

Hall-Landers engaged two experts in support of Class Certification and to calculate damages for the Proposed Class. (*See* Decl. of Steven P. Gaskin ("Gaskin Decl."), ECF No. 119; Decl. of Colin B. Weir ("Weir Decl."), ECF No. 120; *see also* Report at 13.) Together, these two experts would design a "web-based conjoint analysis) that would determine "the difference in market value between in-person classes and full access to [NYU's] campus and facilities, compared to the market value of online classes and no access to [NYU's] campus or facilities, at the time and point of acceptance." (Report at 14; Gaskin Decl. ¶¶ 14–57.) Using the results from this conjoint analysis, along with NYU's "own available records, third-party records, [and] industry resource," the experts would then calculate class-wide damages. (Weir Decl. ¶ 9.) [3]

[3] Hall-Landers's proposed formula to calculate class-wide damages is "%Overpayment Factor × $Tuition × %Prorate = Damages." (Weir Decl. ¶ 44.)

**\*3** NYU engaged two experts in rebuttal. These experts noted that Hall-Landers's experts failed to consider several factors, including real-world data and outcomes. (Decl. of Rebecca Kirk Fair ("Kirk Fair Decl."), ECF No. 135-71 at 7–9; Decl. of Jonathan T. Tomlin, ECF No. 135-72 at 6–7.) They also stated that a conjoint analysis would be inappropriate in this case because a conjoint analysis measures changes in willingness to pay, not actual changes in tuition prices, and is necessarily inappropriate for studies involving a "multi-attribute, bespoke product such as higher education," and it cannot "appropriately model[ ] or describe[ ]" the "extraordinary circumstances surrounding the COVID-19 pandemic." (Kirk Fair Decl. at 4.) Thus, Hall-Landers's proposed study "would materially inflate" its results and lead

to an overestimation of "the fair market value of in-person instruction and NYU campus access," thus inflating damages. (*Id.* at 4–5.)

**D. Procedural Background**
This action was originally filed by plaintiff Christina Rynasko in 2020. (*See* Compl., ECF No. 1.) This Court granted NYU's motion to dismiss that action on the grounds that Rynasko, as a parent, lacked Article III standing and denied as futile Rynasko's motion to amend to add Hall-Landers as a plaintiff. *Rynasko v. New York Univ.*, No. 20 CIV. 3250, 2021 WL 1565614, at *2–4 (S.D.N.Y. Apr. 21, 2021). On appeal, the Second Circuit affirmed the dismissal but found that it would not be futile to amend the complaint to include Hall-Landers as a plaintiff because "the Proposed [Second Amended Complaint] states plausible claims for breach of contract, unjust enrichment, and money had and received[,]" aligning itself with three other circuits that "have recognized the plausibility of implied breach of contract claims brought by students seeking partial tuition reimbursements in the COVID-19 context." *Rynasko v. New York Univ.*, 63 F.4th 186, 193, 197 (2d Cir. 2023).

This Court referred the case to Magistrate Judge Cave for general pretrial supervision and settlement. (Referral to Magistrate J., ECF No. 75.) After the case was remanded back to this Court, Hall-Landers filed the Second Amended Complaint. (SAC.) Plaintiff submitted the Class Motion on June 21, 2024. (Class Mot.) After briefing and oral argument, Magistrate Judge Cave submitted the Report on December 6, 2024. (Report.)

**II. LEGAL STANDARDS**

**A. Reports and Recommendations**
A court "may accept, reject, or modify, in whole or in part, the findings or recommendations" set forth within a magistrate judge's report. 28 U.S.C. § 636(b)(1)(C). When there are no objections to a magistrate judge's report, a district judge reviews the report for clear error. *See Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. Feb. 7, 2006) (citations omitted). The court must review *de novo* the portions of a report to which a party properly objects. *Id.* at 347. However, "[w]hen a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. Mar. 6, 2009). Clear error is present when "upon review of the entire record, [the court is] 'left with the definite and firm conviction that a mistake has been committed.' " *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) (citation omitted).

**B. Class Certification**
In order to be certified as a class, a putative class must satisfy the "four prerequisites set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010); *In re JP Morgan Chase & Co. Sec. Litig.*, No. 12 Civ. 3852, 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015). "In addition to the four factors enumerated in Rule 23(a), there is an 'implied requirement that the membership of the class is identifiable and ascertainable.' " *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 203 (S.D.N.Y. Aug. 16, 2018) (citation omitted). "A class is ascertainable if it is (1) sufficiently bounded so that it is feasible for the court to determine whether a particular individual is a member, and (2) defined by objective criteria that avoid a 'mini-hearing on the merits of each case.' " *In re Namenda*, 331 F. Supp. 3d at 203 (citing *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017)).

*4 Class certification must also be appropriate under one of the three subdivisions of Rule 23(b). *Brown*, 609 F.3d at 476. Judge Cave correctly noted that Rule 23(b)(3) governs the proposed class action here. (Report at 19.) Pursuant to Rule 23(b)(3), a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Plaintiffs must satisfy the Rule 23 requirements by a preponderance of the evidence. *Brown*, 609 F.3d at 476; *In re JP Morgan*, 2015 WL 10433433, at *2. "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *In re Namenda*, 331 F. Supp. 3d at 201 (quoting *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. Nov. 16, 2011)). Finally, "[a]lthough this Court's 'class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff[s'] underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *In re JP Morgan*, 2015 WL 10433433, at

*2 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013)).

Judge Cave found that Hall-Landers has met the Rule 23(a) requirements but has not met the predominance and superiority requirements under Rule 23(b)(3), and thus recommends that this Court deny the Motion. (Report at 21.) Hall-Landers timely objected to the findings that the Class Certification Motion did not meet the Rule 23(b)(3) requirements of predominance and superiority. (Pl. Obj. at 1.) NYU timely objected to the finding that Hall-Landers is an adequate class representative. (Def. Obj. at 1.) Thus, this Court reviews those portions of the Report *de novo*, and the other sections of the Report for clear error.

### III. RULE 23(a) REQUIREMENTS

#### A. Numerosity

Hall-Landers posits that the Proposed Class contains "tens of thousands" of undergraduate students who were enrolled at NYU in Spring 2020. (Class Mot. at 19.) NYU did not address numerosity in its briefing, but its submitted evidence demonstrates several thousand undergraduate students enrolled for the Spring 2020 semester. (Decl. of MJ Knoll-Finn, ECF No. 147 at Fig.3.) In this Circuit, there is a presumption of numerosity at 40 putative class members; thus, joinder of all individual claims of all potential plaintiffs is impractical. The Proposed Class is therefore sufficiently numerous. *See Stewart v. Hudson Hall LLC*, No. 20 Civ. 885, 2021 WL 6285227, at *7 (S.D.N.Y. Nov. 29, 2021).

#### B. Commonality

Under Rule 23(a)(2), Plaintiffs must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires Plaintiffs to demonstrate that the proposed class members "have suffered the same injury," meaning that courts should look to "the capacity of a class-wide proceeding to generate common answers" to the questions raised by common claims of a putative class. *Wal-Mart Stores, Inc. v. Duke*, 564 U.S. 338, 349–50 (2011). Significantly, however, "[d]espite the rigor of the Rule 23 requirements, commonality has never been understood to require that all issues must be identical as to each member, but rather [to] require[ ] that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Meyer v. US Tennis Ass'n*, No. 11 Civ. 6268, 297 F.R.D. 75, 82-83, (S.D.N.Y. Dec. 6, 2013) (internal quotation marks omitted).

*5 Merely suffering the same violations of law is not sufficient to establish commonality. (*See* Report at 22 (citing cases).) However, Hall-Landers has presented common questions regarding contract formation and liability (for example, did each student enter into a contract with NYU for in-person instruction during the Spring 2020 semester?). (*See* Report at 23.) These questions arise from the core of the dispute, which is enough to meet the requirements for commonality.

#### C. Typicality

"To ensure that named plaintiffs' interests are aligned with those of the putative class members whom they seek to represent, Rule 23(a)(3) requires that the claims of named plaintiffs be typical of the claims of the proposed class." *Enea v. Bloomberg, L.P.*, No. 12 Civ. 4656, 2014 WL 1044027, at *4 (S.D.N.Y. Mar. 17, 2014). "The purpose of typicality is to ensure that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Davis v. City of New York*, No. 10 Civ. 0699, 2013 WL 4712501, at *164 (S.D.N.Y. Aug. 29, 2013) (internal quotation marks and citation omitted). "Courts tend to interpret typicality as requiring that the class members' claims arise from the same course of events, meaning [that] each class member must make similar legal arguments to prove the defendant's liability." *Jacob v. Duane Reade*, 289 F.R.D. 408, 416 (S.D.N.Y. Mar. 20, 2013) (internal quotation marks omitted) (citing *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).

Here, the claims of all putative class members would arise from the same course of events: the putative class members' paid enrollment at NYU and NYU's shift to online instruction during the Spring 2020 semester. Thus, these claims would involve substantially similar legal arguments and typicality is met.

#### D. Ascertainability

In the Second Circuit, "a class must be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member,' and must be 'defined by objective criteria that are administratively feasible,' such that 'identifying its members would not require

a mini-hearing on the merits of each case.' " *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 334 (S.D.N.Y. Apr. 23, 2021), *appeal denied*, 2021 WL 5443265 (2d Cir. Sept. 16, 2021) (quoting *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017)); (Report at 27.)

In its briefing to Magistrate Judge Cave, NYU argued that an individualized review of student records to determine who paid tuition, and is therefore in the Proposed Class, was too burdensome a task. (*See* Report at 27–28.)[4] However, the operative question is not *who* paid tuition on behalf of each student, but which students had their tuition paid. (*See id.* at 28 and cited cases.) In other words, "it does not matter ... whether students paid tuition out of their own pocket or had the assistance of a third party." (*Id.*) Thus, it is administratively feasible for NYU to determine which students' tuition was paid. The Proposed Class is therefore ascertainable.

[4] To reiterate, however, NYU does not object to Magistrate Judge Cave's recommendation on this issue.

### E. Adequacy

The fourth prong of Rule 23(a) mandates that parties seeking to certify a class demonstrate that the named plaintiffs will "fairly and adequately" represent that class. Fed. R. Civ. P. 23(a)(4). "Adequacy has two components: '[f]irst, class counsel must be qualified, experienced and generally able to conduct the litigation,' and '[s]econd, the class members must not have interests that are antagonistic to one another.' " *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. Mar. 30, 2021) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)); *see In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir.2006)) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."). To defeat class certification on adequacy grounds, any conflicts must be "fundamental." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). The Court may also consider "the honesty and trustworthiness of the named plaintiff." *Savino v. Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998).[5]

[5] The parties do not contest that Bursor & Fisher, P.A. would be adequate class counsel. (Report at 25.)

**\*6** The crux of NYU's argument is that Hall-Landers is an inadequate class representative because of Plaintiff's inconsistent statements across parts of the record. (*See generally* Def. Obj.) For example, NYU points out that Hall-Landers initially sought to certify classes for both tuition and fees, even though NYU had already refunded the fees at issue; sought reimbursement for the cost of a ballet barre purchased after the Spring 2020 semester was over; made inconsistent statements about whether Hall-Landers's father paid the Spring 2020 tuition directly to NYU or whether Hall-Landers personally paid tuition; and made other inaccurate statements regarding specific classes or services. (*Id.* at 4–7.) These inconsistencies, NYU argues, damage Hall-Landers's credibility enough to make Plaintiff an inadequate class representative. (*Id.* at 8–12.) NYU also argues that these inconsistencies "demonstrate ... a lack of knowledge about the most critical aspects of [Hall-Landers's] case," which "precludes adequacy." (*Id.* at 12.) Finally, NYU argues that these inconsistencies mean that Hall-Landers has interests adverse to those of the rest of the class, because Hall-Landers would be subject to "damaging cross examination" at trial and therefore "seriously prejudice" the class they would represent. (*Id.* at 14–15.)

A lack of credibility may only serve as a basis for finding a class representative inadequate when "the success of the legal claim is substantively jeopardized by the inconsistent testimony at issue." *Hua Mui v. Union of Needletrades, Indus. & Textile Emps., AFL-CIO*, No. 97 Civ. 7270, 1999 WL 4918, at \*4 (S.D.N.Y. Jan. 5, 1999); *see Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. Sept. 15, 2008) (finding that credibility issues undermine adequacy "only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members." (internal quotations omitted)). That is not the case here.

NYU cites numerous cases in support of its contention that Hall-Landers is inadequate; however, the credibility issues in each of them were significantly more severe than the ones NYU alleges here. In *Kline v. Wolf*, the plaintiff testified that "he had relied upon a report which he now admits did not exist at the time he allegedly relied upon it." *Kline v. Wolf* 702 F.2d 400, 403 (2d Cir. 1983). Similarly, in *Friedman-Katz v. Lindt & Sprungli*, the plaintiff repeatedly and "purposely gave false testimony" about numerous topics; the court found that her attorneys "knew that these statements were false ... and likely

also encouraged the testimony." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 160 (S.D.N.Y. Nov. 19, 2010). Both these cases involved major falsehoods that were either impliedly or explicitly intentional, which led the court to conclude that a plaintiff who was willing to lie under oath had general credibility issues that undermined their adequacy as class representative. That is not the case here. There is no evidence, and NYU does not allege, that Hall-Landers intentionally lied or otherwise deliberately tried to mislead the Court. The inconsistencies in Plaintiff's pleadings and statements may be "inartful," but do not rise to the level of severity that would cause this Court to question Plaintiff's general credibility as a witness. (Report at 27.)

In the same vein, *Savino v. Computer Credit* and *Spagnola v. Chubb Corp.* involved credibility issues that involved core subjects of their respective lawsuits. In *Savino*, the plaintiff "repeatedly changed his position as to whether he received" a credit collection letter. *Savino*, 164 F.3d at 87. This letter itself contained the legal violation at issue; in other words, it "form[ed] the very basis for his lawsuit." *Id.* at 87. In *Spagnola*, the plaintiff testified at deposition that he "never believed" a key allegation in his complaint to be true, and that the belief he alleged in the complaint was unreasonable. *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 96 (S.D.N.Y. Jan. 7, 2010). There was also a multitude of other reasons for the court to find inadequacy, including other "abjuration[s] of the very allegations in his complaint" and conflicts with another named plaintiff. *Id.*

In contrast, Hall-Landers has not repeatedly flip-flopped on any of the issues at hand. More importantly, none of Hall-Landers's inconsistencies involve the core issue of this lawsuit: whether NYU owes a tuition refund for its move to remote instruction in Spring 2020. The vast majority of the alleged inconsistencies concern fees that are no longer at issue in this case, since Hall-Landers is now seeking only a tuition refund. Thus, Hall-Landers's inconsistencies "do not specifically relate to the legal issues ... central to this lawsuit" and therefore do not render the named plaintiff an inadequate class representative. *Hua Mui*, 1999 WL 4918, at *4; *see Hasemann v. Gerber Prods. Co.*, No. 15 Civ. 2995, 2019 WL 2250687, at *8 (E.D.N.Y. Feb. 20, 2019), *report and recommendation adopted as modified*, 331 F.R.D. 239 (E.D.N.Y. 2019) ("The action does not rise or fall on the Plaintiffs' [inconsistencies]. This case, therefore, bears more resemblance to those in which courts have held that inconsistencies in deposition testimonies are generally insufficient to disqualify plaintiffs from representing the class." (quotations omitted)). [6]

[6] NYU cites to *Kline* for the proposition that Hall-Landers should be found inadequate despite the fact that the inconsistent statements pertain to fees, not tuition, because Plaintiff previously brought a claim for fees. (Obj. at 11–12.) The court in *Kline* found that the plaintiff's inconsistent testimony regarding one cause of action rendered the plaintiff inadequate as to the whole case. *See Kline*, 702 F.2d at 403. Importantly, however, the court did *not* rule that this is true as a matter of law. In other words, the court did not find that damaging inconsistencies regarding one cause of action necessarily doom the plaintiffs' adequacy as a general matter; instead, the court found that the plaintiffs' credibility issues were so severe that "their credibility in general was sufficiently in doubt" to render them generally inadequate representatives. *Id.* As further discussed in this section, Hall-Landers's credibility issues do not rise to that level.

**\*7** Also for these reasons, Hall-Landers's knowledge about this case is sufficient to qualify them as an adequate class representative. NYU's primary examples of Hall-Landers's lack of knowledge pertain to knowledge about which fees were at issue and which fees had already been refunded; but since Plaintiff is no longer seeking refunds of those fees, those lapses do not render Hall-Landers unknowledgeable. (*See* Def. Obj. at 12–14.) [7]

[7] NYU argues that abandoning the fees claim is insufficient as a remedy, but this logic applies only to credibility: credibility cannot be remedied by abandoning a claim because the plaintiff has already exposed facts bearing on credibility generally. (Def. Obj. at 11.) Knowledge is a different requirement: the plaintiff only needs to be knowledgeable about key parts of the actual case, and Hall-Landers has fulfilled those requirements. *See Flores v. Anjost Corp.*, 284 F.R.D. 112, 129–30 (S.D.N.Y. June 19, 2012).

Finally, in *Garcia*, that plaintiff gave testimony that was demonstrably false, then tried to excuse it when presented with evidence that it was false. *See, e.g.*, *Garcia De Leon v. New York Univ.*, No. 21 Civ. 05005, 2022 WL 2237452, at *5–6 (S.D.N.Y. June 22, 2022) (describing how plaintiff

claimed she visited campus several times even though there was no record of her entry into the buildings, then said her friends let her in, and how plaintiff claimed she had tried to call NYU's health and wellness center when there was no record of her phone call, then said she had an old phone number but could not remember what that number was). The plaintiff in *Garcia* also failed to comply with a court order expediting discovery. *Id.* at *7–*8. The court considered all of those factors when ruling that she was not an adequate class representative, explaining that "Plaintiff has already established that she cannot be trusted to cooperate with court-ordered discovery and has made statements (such as 'I don't know what "diligent" means') that render it inappropriate for her to represent anyone except herself" and that "this court would never certify a class representative who, though a graduate student at a major university, could not recall her own phone number." *Id.* at *13, *15.

Hall-Landers does not suffer from such memory lapses here, nor does Plaintiff try to get out of any previous inconsistent statements by offering flimsy excuses or further falsehoods. Instead, many of the alleged inconsistencies are plausibly explained by offered explanations: that Hall-Landers wanted to proceed through discovery to determine which specific fees were not refunded before abandoning the fees claim, for example. (Pl.'s Rep. to Def.'s Objs. ("Pl. Rep."), ECF No. 199, at 7.) Other statements might also be explained as misunderstandings, simple forgetfulness, or oversights.[8] NYU may disagree with those characterizations, but they are plausible enough to preclude a finding that Hall-Landers is so incredible as to be an inadequate class representative.

[8] For example, the discrepancy about who paid Hall-Landers's tuition is not as significant as NYU makes it out to be. First, Hall-Landers never stated who personally paid tuition in their interrogatory answers; the interrogatory NYU cites states: "Identify all of the Tuition and Fees You paid for the Spring 2020 semester **for which You are seeking a refund**." (Pl.'s Resp. to Def.'s Interrog. No. 11, ECF No. 141-61 at 15.) Moreover, the declaratory statement that "I paid" tuition serves merely to identify that tuition was paid for Hall-Landers's enrollment and the amount of that tuition; many students would state that "they paid" tuition when their parents actually did so on their behalf. (*see* Def. Obj. at 6.) At no point did Hall-Landers claim that anyone paid tuition other than Plaintiff's

father when asked, or deny that the parent made the payment.

**\*8** NYU's last argument is that Hall-Landers had positive experiences with professors and classes, which contradicts the allegation that "remote instruction was not worth the tuition." (Def. Obj. at 14–15; Report at 26.) NYU argues that this renders Hall-Landers's interests adverse to those of the putative class, because Plaintiff would be subject to cross-examination at trial, and the class would suffer other prejudice as a result. (*Id.* at 14–15.) Not so. For one, acknowledging that professors and classes did an admirable job in Spring 2020 does not necessarily mean that the classes had the same value as they did when they were in person; something can be less valuable but still commendable. Moreover, as discussed above, these concerns are not so significant that cross-examination at trial would be prejudicial to other class members.

In sum, Hall-Landers's inconsistencies and conduct have been significantly less severe than the conduct that has rendered plaintiffs so incredible as to be inadequate as class representatives in this Circuit. Hall-Landers is an adequate class representative.

### IV. RULE 23(b) REQUIREMENTS

**A. Predominance**

Predominance requires that "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and [that] these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). To determine if predominance is met, courts "assess (1) the elements of the claims ... to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (internal quotations omitted). Naturally, then, a predominance analysis will often "overlap with merits issues." *Id.*

#### 1. Breach of Implied Contract

Under New York law, "an implied contract is formed when a university accepts a student for enrollment." *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81,

93 (2d Cir. 2011). The main dispute here is whether an in-person education was a term of an implied contract entered into by the putative class members and NYU. (*See* Report at 32.) In argument, Hall-Landers points to three main pieces of evidence: (1) the Albert portal, which students used to choose classes for the Spring 2020 semester, described in-person classes as "in-person" and listed classroom locations for in-person classes; (2) marketing materials sent to prospective students described the benefits of an in-person, on-campus education; and (3) NYU's past course of conduct established in-person instruction as the "campus norm." (*See* Pl. Obj. at 2–9, 13–14.) The first and third do not constitute valid bases for an implied contract term; the second would require individualized proof. Thus, predominance is not satisfied as to this claim.

Hall-Landers submits that common evidence predominates regarding the Albert portal, which students used to register for classes, and which described the "Instruction Mode" of relevant classes as "In Person." (*Id.* at 13.) [9] However, multiple cases in this District have held that information about class times and locations, including in a course catalogue or online registration portal, "do not constitute a specific promise to provide exclusively in-person teaching." *Amable v. New Sch.*, 551 F. Supp. 3d 299, 311 (S.D.N.Y. July 27, 2021) (citing *Hassan v. Fordham Univ.*, 515 F. Supp. 3d 77 (S.D.N.Y. Jan. 28, 2021), *opinion amended and superseded in part on other grounds*, 533 F. Supp. 3d 164 (S.D.N.Y. Apr. 6, 2021); *see, e.g., In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414 (S.D.N.Y. Feb. 26, 2021), *aff'd sub nom. Tapinekis v. Pace Univ.*, No. 22-1058-CV, 2024 WL 2764146 (2d Cir. 2024)); *id.* at 309–12 (discussing other cases). In each of these cases, the court has held that references to locations, instructional formats, and course times do "not imply a contractual entitlement to continued instruction in the same location and manner." *Morales v. New York University*, No. 20 Civ. 4418, 2021 WL 1026165, at *1 (S.D.N.Y. Mar. 17, 2021); *see Amable*, 551 F. Supp. 3d at 311; *Columbia*, 523 F. Supp. 3d at 423; *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180, 194 (S.D.N.Y. Apr. 21, 2021), *aff'd*, 88 F.4th 204 (2d Cir. 2023); *Hassan*, 515 F. Supp. 3d at 87–89. For the same reason, the Albert Portal is not common evidence that NYU made a promise of in-person instruction. Though course listings in the Portal may have demonstrated a plan for in-person instruction, that plan was not a specific promise to provide in-person teaching at all times, or a guarantee that "these aspects of a course were not subject to change." *Hassan*, 515 F. Supp. 3d at 88. Thus, the Albert Portal does not establish common evidence of an implied contract for in-person instruction.

[9] Hall-Landers cites *Rynasko* for the proposition that the Albert Portal should be considered evidence of an in-person contractual term; more specifically, Hall-Landers argues that the Second Circuit held that "NYU's course catalog, which designated ... courses as 'in-person' ... [forms] the basis of the implied contract promising in-person services." (Pl. Obj. at 13 (citing *Rynasko*, 63 F.4th at 198).) This mischaracterizes *Rynasko*. As Magistrate Judge Cave correctly noted, *Rynasko* held only that an "online registration portal" may be one of many factors to be considered when determining whether a plaintiff had "plausibly alleged the existence of an implied contract *at the pleading stage*." (Report at 31); *see Rynasko*, 63 F.4th at 198. In other words, *Rynasko* only determines the *plausibility* of the claims in the complaint. *Rynasko* does not determine the dispositive effect of any piece of evidence on the outcome of such claims or the outcomes themselves.

**\*9** Hall-Landers also argues that NYU's university-wide marketing materials contain promises of in-person experiences, citing a pamphlet and mailer that contained representations regarding the benefits of attending school in New York City, NYU's on-campus resources, and hands-on experience at NYU, including "studios, laboratories, athletic and recreational facilities, student centers, [and] student clubs and organizations." (Class Mot. at 20–21; *see* Pl. Obj. at 13–14.) These materials fail to establish that common evidence predominates for two reasons.

First, the statements contained in these materials are not specific enough to establish a contractual right. "Within the student-university relationship, a student must identify specific language in the school's bulletins, circulars, catalogues and handbooks which establishes the particular contractual right or obligation alleged by the student.... General policy statements and broad and unspecified procedures and guidelines will not suffice." *Flatscher v. Manhattan Sch. of Music*, 551 F. Supp. 3d 273, 281–82 (S.D.N.Y. July 20, 2021) (internal quotations omitted). Hall-Landers cites evidence that NYU sent all prospective students materials containing information about over 400 clubs and organizations, "a list of intramural leagues," and a general description of "a variety of opportunities and resources that could be available" to students, as well as the general benefits of attending school in New York City. (Dep. of Martin

Dorph, ECF No. 122-5, at 58:16–63:8; *see* Pl. Obj. at 13–14.) None of the statements Hall-Landers identifies constitutes a specific promise of in-person instruction. Instead, these are examples of "mere 'opinion or puffery' that is too vague to be enforced as a contract." *Columbia*, 523 F. Supp. 3d at 423 (holding that statements advertising the "on-campus experience" in marketing materials were too broad to support a breach of contract claim); *see id.* ("Along the same lines, references to Columbia's 'physical location in New York City' in University publications and marketing materials do not support Plaintiffs' contract claim, because there is no claim that the University's actual location has changed.") Hall-Landers identifies no specific statement in any of NYU's university-wide materials that promises uninterrupted in-person teaching or "any express language promising the 'certain specified service' of in-person classes." *Zagoria v. New York Univ.*, No. 20 Civ. 3610, 2021 WL 1026511, at *4 (S.D.N.Y. Mar. 17, 2021).

Even if these marketing materials constituted proof of an implied promise of in-person instruction, establishing which putative class members received which materials requires an individualized inquiry. As NYU points out, because Hall-Landers was a waitlisted student, Plaintiff would not even have *received* one of the two pamphlets identified as proof of the implied term. (Def. Obj. at 16; *see* Pl. Obj. at 13–14.) Hall-Landers argues that it does not matter whether putative class members saw or relied upon any particular statement in deciding to enroll at NYU, because contract terms are enforced regardless of whether a party read them. (Pl. Obj. at 15.) But the question here is not whether a putative class member read or relied upon a particular statement or term before agreeing to the contract; it is whether that term was provided to the putative class member at all. In other words, to determine what the terms of any student's contract with NYU dictated, this Court would have to determine what materials they received in the first place—a different question from whether they read the materials or relied upon them. This is an individualized inquiry that would require looking into which students received different materials, what statements those different materials contained, and whether those statements contained specific promises of in-person instruction. Thus, the marketing materials Hall-Landers provides do not constitute common evidence of the terms of an implied contract with a class of plaintiffs.

**\*10** Finally, this Court has been clear that "[b]reach of contract actions between a student and a university must be grounded in a text and may not be inferred from the conduct of the parties." *Zagoria*, 2021 WL 1026511, at *5. Thus, Hall-Landers's argument that NYU's "course of dealing" and past conduct, "on its own, form an implied term for in-person instruction" is unavailing. (Pl. Obj. at 16.) [10] This argument has been directly rejected multiple times in this District and similarly fails here. *See, e.g.*, *Columbia*, 523 F. Supp. 3d. at 423 ("[T]he fact that Columbia provided in-person instruction in Plaintiffs' courses before March 2020 does not imply a contractual entitlement to continued instruction in the same location and manner."); *Hassan*, 515 F. Supp. 3d at 89 (rejecting the proposition that "a promise to provide in-person education, based on the nature of Plaintiff's dealings with Fordham, is not grounded in a text but rather implied in custom, specifically the customary in-person nature of Fordham's undergraduate programming" (internal quotations omitted)); *Amable*, 551 F. Supp. 3d at 313–16.

[10] Hall-Landers cites *Rynasko* and a USC refund case as support for this proposition. (Pl. Obj. at 16.) As stated above, however, *Rynasko* held only that NYU's course of dealing, when taken together with other factors, signaled that an implied contract for in-person instruction potentially *could* exist, not that one did. *See supra* n.9. Moreover, the prevailing caselaw in this District on the breach-of-contract issue supersedes the USC case (as well as the Pepperdine case Hall-Landers cites elsewhere), which applied California law. (*See* Pl. Obj. at 15–16 (citing *In re USC Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d 1128 (C.D. Cal. 2023); *In re Pepperdine Tuition & Fees COVID-19 Refund Litig.*, 2023 WL 6373845 (C.D. Cal. 2023)).) Moreover, *USC* and *Pepperdine* do not consider breach-of-contract claims. *See Pepperdine*, 2023 WL 6373845, at *1; *USC*, 695 F. Supp. 3d at 1136.

In sum, the formation and terms of any implied contracts between NYU and its students could not be proved by common evidence across the putative class. It thus follows that the questions of breach, injury, and causation would also require individualized inquiry: if students entered into contracts with NYU that had different terms and expectations, then whether NYU breached those contracts is necessarily an individualized inquiry. Hall-Landers argues that breach is common because all students moved to remote instruction and NYU made a university-wide determination not to provide refunds. (Pl. Obj. at 18.) The former belies the fact that each student's move to remote instruction occurred under different financial and personal circumstances, and the latter

is not entirely accurate. For one, the amount of tuition each student paid to NYU during the Spring 2020 varied based on the school, program, or number of credits they were enrolled in. (Report at 6–7.) In addition, NYU did not make a university-wide determination not to provide refunds. Instead, it permitted students to petition their schools for individual refunds; each school then made individualized decisions regarding those requests. (*Id.* at 9.) NYU also analyzed whether each class could be taught remotely and provided refunds for the seven classes for which it determined could not. (*See id.* at 10.)

All of this means that there is significant variance among the actual injuries suffered by putative class members: First, they may have paid different amounts of tuition. Then, some of them may have requested a refund; there has been no showing of how many requests were filed and how many were granted. A different, though possibly overlapping, subset of students may have been in one or multiple of the seven classes that were cancelled, and therefore received automatic refunds. Presumably, the amount refunded was different for a student who was enrolled in one of the cancelled classes and a student who was enrolled in two, or three, or more. The amount of the automatic refunds also differed based on the proportion of the cancelled classes to a student's courseload; if four of a student's 18 units was cancelled versus four of a student's 12, for example. (*See* Report at 10 ("[I]f a student who was enrolled in one or more of the seven canceled classes nonetheless remained within the applicable flat rate tuition range of credits, they would not have received a refund because their tuition obligation did not change." (internal quotations omitted).) This variance among students necessitates an individualized inquiry into just how much a student paid and how much, if at all, the student got back. This also sets this case apart from *USC, Pepperdine*, and *Ninivaggi*, which Hall-Landers cites in their brief: in those cases, everybody "paid the same tuition at the same fixed price." *Pepperdine*, 2023 WL 6373845, at *10; *see USC*, 695 F. Supp. 3d at 1159 (citing *Ninivaggi v. University of Delaware*, 2023 WL 2734343 (D. Del. Mar. 31, 2023)).

**\*11** For each element of the breach-of-contract claim, common questions do not predominate over individualized ones. Hall-Landers's request to certify the Proposed Class on a theory of breach of implied contract is therefore denied.

 2. Unjust Enrichment
To prevail on an unjust enrichment claim in New York, a plaintiff must establish "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). To do so, the plaintiff must show "that the benefits that the members of the plaintiffs' class received were less than what they bargained for." *Vigiletti v. Sears, Roebuck & Co.*, 838 N.Y.S.2d 785 (2d Dep't 2007).

Hall-Landers argues that the proposed damages model would sufficiently calculate the amount of undue benefit NYU received across all putative class members such that an individualized inquiry would be unnecessary, pointing to *USC, Pepperdine*, and *Ninivaggi* as three tuition-refund cases in which classes were certified based on similar conjoint analyses. (*See* Pl. Obj. at 23–24.) As previously noted, however, those three cases applied different states' laws to find that the proposed damages models sufficed in situations when "all the members of the Proposed Class paid for an in-person education for the same fixed price," and unjust enrichment was therefore not an individualized question. *USC*, 695 F. Supp. 3d at 1159 (citing *Ninivaggi*, 2023 WL 2734343 (D. Del. 2023)); *see Pepperdine*, 2023 WL 6373845, at *10. That is not the case here. As discussed above, there is considerable variance in the amounts of tuition the putative class members here paid to NYU, both at baseline and due to numerous potential individual refunds. Thus, whether NYU was unjustly enriched based on the amount of tuition paid by the putative class would require individual inquiries into, *inter alia*, how much each student was originally charged, whether they requested or received a refund, and whether they received a refund for enrollment in one or more of the seven classes that were cancelled in Spring 2020.

Moreover, whether "equity and good conscience require restitution" presents "intractably individualized issues." *Choi v. Tower Rsch. Cap. LLC*, No. 14 Civ. 9912, 2022 WL 4484485, at *9 (S.D.N.Y. Sept. 27, 2022). As Magistrate Judge Cave noted, this element requires determining "whether NYU failed to meet the quality and value of education each student expected of it.," which "necessarily involves delving into each putative class member's own circumstances—not necessarily the grades they received or the extra-curricular programming and services they utilized, but the net enrichment of the degree-program they signed up for together with their expectations of it." (Report at 37.) In other words, whether equity and good conscience warrant damages depends on numerous individual factors, such as the student's course of study, the amount of in-person services and facilities they expected to use, and, ultimately, whether they

obtained the education they expected when they paid tuition for the Spring 2020 semester. *See, e.g.*, *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742, 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010) ("Individualized inquiries would be required to determine, for instance, whether class members were fully informed about the inclusion of HFCS in Snapple beverages, whether they believed HFCS to be natural, and whether they continued to purchase Snapple despite their beliefs concerning HFCS."); *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, No. 15 Civ. 9945, 2018 WL 4253152, at *10 (S.D.N.Y. Sept. 6, 2018) (denying class certification on unjust enrichment claim because individual expectations precluded predominance).

**\*12** In sum, individual questions predominate Hall-Landers's unjust enrichment claim. Class certification on this claim is therefore denied.

3. Money Had and Received

In New York, the elements of a money had and received claim are "essentially identical to a claim of unjust enrichment." *Johnson v. JP Morgan Chase Bank, N.A.*, 488 F. Supp. 3d 144, 160 (S.D.N.Y. Sept. 21, 2020). For the reasons provided above, Hall-Landers's money had and received claim also requires an individualized analysis and thus fails the predominance inquiry.

B. Superiority

In considering whether a class action is the superior method of adjudicating the instant action, this Court considers "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Hall-Landers's failure to establish predominance renders a superiority analysis unnecessary. Even so, the fact that individual issues of fact dominate over common issues means managing a class action would likely be sufficiently difficult under (D) to preclude a finding of superiority. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 4394, 2018 WL 1750595, *20 (S.D.N.Y. Apr. 11, 2018) ("Given the Plaintiff's failure to establish predominance ... its failure to establish superiority largely follows.") Thus, Hall-Landers has also failed to establish that a class action is the superior method of adjudication here.

V. CONCLUSION

Because Hall-Landers has not met the requirements for class certification under Rule 23(b)(3), Plaintiff's motion for class certification is DENIED for all claims. The Clerk of the Court is directed to close the motion at ECF 117.

SO ORDERED:

**All Citations**

Slip Copy, 2025 WL 919195