# EXHIBIT B

2025 WL 978151
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois.

ORION EDDLEMON, individually and on
behalf of all others similarly situated, Plaintiff,
v.
BRADLEY UNIVERSITY, an Illinois
not-for-profit corporation, Defendant.

Case No. 20-cv-1264
|
Filed: 03/31/2025

**OPINION**

COLLEEN R. LAWLESS UNITED STATES DISTRICT
JUDGE

**\*1** Before this Court is Defendant Bradley University's
Motion for Summary Judgment (Doc. 43).

## I. PROCEDURAL BACKGROUND

On November 19, 2021, Eddlemon filed his Second Amended
Complaint on behalf of himself and others similarly situated,
alleging breach of contract and unjust enrichment claims
against Bradley University. (Doc. 14). Eddlemon argues the
University breached an implied contract to provide 15 weeks
of classes in exchange for $17,100 in tuition, on-campus
activities in exchange for an $85 activity fee, and on-campus
access to a laboratory and laboratory supplies in exchange for
a $25 course surcharge. (*Id.* at 30). He argues that he is entitled
to a refund for part of his tuition, activity fees, and course
surcharge after the University extended its spring break and
then moved campus activities to an online-only format in
response to the COVID-19 pandemic. (*Id.* at 31).

## II. UNDISPUTED FACTS [1]

[1]   Unless otherwise noted, the factual background of
this case is drawn from the undisputed facts as
conceded to in Defendants' statement of material
facts; Plaintiff's response to Defendants' statement
of material facts and additional material facts;
Defendants' reply to Plaintiff's additional material
facts; and exhibits to the filings. Exhibit citations

are used for facts that the Court finds are undisputed
from the summary judgment record.

Bradley University, located in Peoria, Illinois, provides
educational instruction on a semester basis. (Doc. 43 at
¶¶1-2). The University's Course Catalog states, "This is
the official catalog for the 2019-2020 academic year. This
catalog serves as a contract between a student and Bradley
University." (Doc. 57 at ¶1). The Catalog contains a section
titled "Academic Calendar," which set out a 15-week
semester schedule for Spring 2020. (Doc. 43 at ¶¶2-3). That
section contains a notice stating, "The academic calendars
are subject to revision. Students should refer to the most
recent Schedule of Classes (http://www.bradley.edu/classes/)
for important dates each semester." (*Id.* at ¶3). The Academic
Calendar indicated that the Spring 2020 semester would start
on January 22, 2020, and continue until May 13, 2020. (*Id.*
at ¶4). Spring break was scheduled from March 14, 2020,
to March 22, 2020. (*Id.*). Classes could be canceled at the
professor's discretion for each course. (*Id.* at ¶33).

Full-time students—those who take 12-16 credit hours—were
all charged $17,100 in tuition. (*Id.* at ¶6). Additionally, the
University charged an $85 activity fee for the Spring 2020
semester to all undergraduate students taking nine credit hours
or more. (*Id.* at ¶9). The Student Activities Budget Review
Committee ("SABRC") is responsible for deciding how to
use the activity fees. (*Id.* at ¶10). In the past, there have been
several semesters in which the activity fees have not been
fully exhausted. (*Id.* at ¶13). Unused funds in the Special
Events Reserve Fund ("SERF") roll over to the next academic
year. (*Id.* at 137).

Certain courses also require students to pay a course
surcharge, which varies depending on the course. (*Id.* at
114). The surcharge fees are used for the maintenance
and replacement of equipment, laboratory infrastructure,
specialized computers and related software, technology
needs, and expenditures outside the scope of regular college
operating funds. (*Id.* at ¶16). The surcharge fees are not
always used in a particular semester, and instead may be
accumulated for use in future semesters. (*Id.*).

**\*2** Due to the COVID-19 pandemic, during the spring
2020 semester, the University closed its campus, canceled
in-person activities for the remainder of the semester, and
canceled one week of classes while it migrated to a remote
learning format. (*Id.* at ¶¶17-19). The University informed the
students of these decisions on March 12, 2020. (*Id.* at ¶22).
It never rescheduled those canceled classes. (*Id.* at ¶19). For

the remainder of the semester, all classroom instruction was conducted remotely, and the University offered some virtual activities and events. (*Id.* at ¶¶22-23).

During the Spring 2020 semester, Eddlemon was enrolled in 15 credit-hours and paid $17,100 in tuition. (*Id.* at ¶28). He was a member of Alpha Epsilon Delta, which held meetings—both in-person and remote. (*Id.* at ¶34). He was also enrolled in two classes with a surcharge fee. (*Id.* at ¶38). He paid a $50 fee for his BIO 250 course, and a $150 fee for his BIO 484 course. (*Id.*). Both courses had a laboratory component. (Doc. 57 at ¶13). Initially, Eddlemon participated in BIO 250 and BIO 484's laboratory components, where he completed numerous hands-on activities, but he did not conduct any experiments in the laboratory after the transition to online learning. (*Id.* at ¶18).

## III. DISCUSSION

### A. Legal Standard

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is only material if its resolution might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). Summary judgment is not appropriate if a reasonable jury could just as easily return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. "At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (internal quotations omitted).

### B. Analysis

The University argues Eddlemon cannot establish valid and enforceable contract terms, a breach of any contract terms, or prove any damages as a result of an alleged breach. The University also argues Eddlemon's unjust enrichment claim fails because the contractual relationship between him and the University precludes such a claim, it is not an independent cause of action, and there is no evidence to support the claim.

To bring a breach of contract claim under Illinois law, a plaintiff must allege "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiffs; (3) a breach by the defendant; and (4) resultant damages." *Sevugan v. Direct Energy Servs.*, LLC, 931 F.3d 610, 614 (7th Cir. 2019) (internal quotations omitted). The contract may be either express or implied. *See Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008). If a plaintiff alleges the breach of an implied contract, he must still "be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return." *Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*, 741 F.3d 769, 773 (7th Cir. 2013).

**\*3** Under Illinois law, the relationship between students and universities is a contractual one, and it is typically an implied contract. *See Gociman v. Loyola University of Chicago*, 41 F.4th 873, 883 (7th Cir. 2022); *Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 666–67 (7th Cir. 2023). For a student to make out a valid breach-of-contract claim against their university, they must "point to an identifiable contractual promise," as opposed to an implied promise of educational quality, "that the [university] failed to honor." *Gociman*, 41 F.4th at 882.

Recently, in *Delisle v. McKendree Univ.*, 73 F.4th 523, 525 (7th Cir. 2023), the Seventh Circuit addressed the evidentiary requirements for a breach of contract claim related to COVID-19 university campus closures. Specifically, the Court stated "students can establish the existence of an implied contract for in-person instruction and access to campus facilities and services by pointing to four primary sources of evidence:" (1) a university's statements in its official publications, such as course catalogs; (2) its class registration system and related policies; (3) its pre-pandemic practice; and (4) any cost differential between in-person and online programs. *Delisle*, 73 F.4th at 525.

To state such a claim for unjust enrichment under Illinois law, "a plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Hernandez*, 63 F.4th at 671, *citing HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill.1989). However, a plaintiff may not recover under an unjust enrichment theory

if there is an enforceable contract that governs the relevant subject matter. *Id., citing Gociman*, 41 F.4th at 886.

### 1. Cancellation of Classes

Eddlemon argues the course catalog language and dates listed in the academic catalog promised him 15 weeks of instruction. He also argues that his course syllabi corroborate the promise of the 15-week schedule. The University argues that the academic calendar sets forth anticipated dates and does not contain a specific promise for class schedules. Additionally, the University argues that the academic calendar is expressly "subject to revision." Eddlemon argues that the word "revision" indicates that the classes should have been rescheduled, not canceled. Finally, he argues the University never revised the calendar, as it never changed its calendar on its website to reflect the additional week of spring break.

The course catalog "serves as a contract between a student and Bradley University." (*See* Doc. 39, Ex. 1). While the catalog does not specifically identify the number of weeks, it does indicate that classes would resume on March 23. (*Id.* at 14). Therefore, a trier of fact could reasonably find that this was a term of the contract between the University and the students. However, the University expressly reserved its right to amend the academic calendar and cancel classes for one week as the course catalog specifically states, "The academic calendars are subject to revision. Students should refer to the most recent Schedule of Classes (http://www.bradley.edu/classes/) for important dates each semester."

Under Illinois law, contractual terms are given their "plain, ordinary, and popular meaning," which can be determined by looking at the dictionary definition. *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011), *citing Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 I11.2d 90 (1993). The Oxford English Dictionary defines the term "revise" as "to examine or re-examine (something, esp. a law, code, plan, or the like) for the purpose of improvement or amendment." *Revise*, Oxford English Dictionary (2010). The definition indicates that when the calendar is revised, things may be added, changed, or removed from it.

**\*4** In a similar case, the Eleventh Circuit held that the University of Miami did not breach its contract with its students when it temporarily closed its campuses in response to the COVID-19 pandemic. *Dixon v. Univ. of Miami, 75 F.4th 1204, 1209 (11th Cir. 2023)*. In that case, the student handbook indicated that the university may amend or alter its procedures and policies. *Id.* The Eleventh Circuit held

that because the university expressly reserved its right to alter its procedures, it did not breach any agreement when it temporarily closed its campus. *Id.*

Just as in *Dixon*, Bradley University included an express reservation of its right to modify its schedule when it included the disclaimer that the calendar was "subject to revision." Because of this express reservation of its right to change its academic calendar, the University cannot be held liable for exercising its right.

Eddlemon further argues that a reasonable jury could find that the University's custom of providing a 15-week semester schedule forms the basis for an implied contract. But as the Second Circuit noted in *Bergeron v. Rochester Institute of Technology*, 2024 WL 5054841, at *2 (2d Cir. 2024), a university's prior "academic and administrative prerogatives cannot be impliedly limited by custom." The Court agrees with the well-reasoned analysis in *Dixon* and *Bergeron* and finds there was no breach of contract when the University added an extra week of spring break or canceled a week of classes.

Eddlemon also argues that the University did not properly revise the calendar because it did not amend the Schedule of Classes. However, at the bottom of the course catalog, the University states that "[s]hould changes in a program of study become necessary prior to the next academic year every effort will be made to keep students advised of such changes via the Dean of the College or Chair of the Department concerned, the Registrar's Office, u.Achieve degree audit system, and the schedule of classes." (Doc. 39, Ex. 1 at 20). Based on that notice, the University was not required to amend the Schedule of Classes. Instead, it was required to make "every effort" to keep students advised of changes. In this case, Eddlemon learned about the change to the schedule when the University communicated the change to its students via email. Therefore, there was no breach of contract based on an improper revision to the schedule. Defendant's Motion for Summary Judgment is granted as to Eddlemon's breach of contract claim based on the canceled classes. Because there is a contract that governs this subject matter, Eddlemon's unjust enrichment claim also fails. *See Hernandez*, 63 F.4th at 671.

### 2. Activity Fee

Eddlemon's activity fee claims revolve around the issue of whether the University breached its contract when it significantly reduced or canceled its on-campus activities. To support his theory that he was entitled to 15 weeks of on-

campus events in exchange for the $85 activity fee, Eddlemon relies on the course catalog, the University's online bulletin/circular, and the SABRC's Articles.

The course catalog indicates that each undergraduate student taking nine or more credit hours must pay an $85 activity fee but does not specify what that fee will be used for. (*See* Doc. 39, Ex. 1). The bulletin indicates that "[i]ntramurals, club sports and fitness classes are available throughout the year" at the Markin Family Student Recreation Center. (Doc. 57 at ¶17). The SABRC Articles state that the activity fees are split among six different funds. (Doc. 39, Ex. 2 at 4). The SABRC budget is "zero-based," which means that "each budgeted dollar shall be justified anew each year." (*Id.* at 1). The purpose of the SABRC is to "fund those student organizations recognized and approved by Bradley University which provide activities for Bradley University students through education, entertainment, or service." (*Id.*). The goals of the organization include providing funds for campus-wide events. (*Id.*).

**\*5** In *Burt v. Board of Trustees of University of Rhode Island*, the First Circuit found that there was a genuine issue of material fact as to whether there was a breach of an implied contract based. 84 F.4th 42, 57-58 (1st Cir. 2023). The court noted that the students could have had reasonable expectations that they would receive in-person access to recreational facilities and on-campus transportation in exchange for their payment of student service fees based on marketing materials. *Id.* However, despite the finding that there was a genuine issue of material fact as to whether there was a breach of an implied contract, the court held that "it is abundantly clear that [the university] was discharged from any such contractual duty due to frustration." *Id.* Neither party could have anticipated either the onset of the pandemic or the governor's emergency orders, and those orders constituted the "event the non-occurrence of which was a basic assumption on which the contract was made." *Id.* at 58, *citing* Restatement (Second) of Contracts § 264 (1981). The court concluded, " [b]ecause it is luminously clear that the contracts were substantially frustrated, there remains no genuine issue of material fact for adjudication: any reasonable factfinder would be compelled to find that [the university] was discharged from its obligations due to frustration." *Id.* Additionally, the Court concluded that the unjust enrichment claims must be dismissed because the students only offered a conclusory statement to support the theory that the university unjustly benefitted from the funds. *Id.* at 59.

In comparison, in *Choi v. Brown University*, 594 F.Supp.3d 452, 460 (D. R.I. Mar. 22, 2022), the court granted summary judgment after finding that the students were not entitled to a refund of their activity fees for three reasons. First, the district court found that there was no indication that the funds were used differently than how they had been in the past. *Id.* For instance, after the pandemic began, if a student organization requested funds, the university disbursed those funds to the organization as necessary. *Id.* Second, the funds were still used to support student organizations, regardless of whether they took place online or in person. *Id.* Third, the funds were rolled over through the following academic year and students did not have to pay the activity fee for the following year. *Id.* For these reasons, the court found that the university did not breach its contract, nor was it unjustly enriched. *Id.*

When looking at the documents in the instant case, there is no express promise as to the number of events that must be held each semester. Although the SABRC's "goal" was to provide in-person, on-campus activities, this language does not constitute a promise to fund events and does not promise any specific number of events throughout the semester. *See Bosch v. NorthShore Univ. Health Sys.*, 2019IL App (1st) 190070, ¶70 ("We have been clear that provisions in school materials must be sufficiently definite in character to constitute a binding promise, as opposed to a general provision discussing a policy, goal, expectation, or guideline."); *Oyoque v. DePaul University*, 520 F.Supp.3d 1058, 1064 (N.D. 1Il. Feb. 21, 2021) (nothing that aspirational statements in a student handbook are not evidence of a contract). Moreover, there was no express promise that these events were to take place in-person.

Additionally, there was no breach of an implied contract. Just like the activity fee in *Choi*, the funds were used similarly to how they were used before the pandemic. Student groups were still able to obtain funding for events, even if the number of events were reduced. In this way, the funds were still used to support student organizations. The materials relied on by Eddlemon do not support his theory that he was entitled to in-person events only. Although the University described examples of in-person activities in the past in its marketing materials —such as concerts, lectures, and other special events—it did not guarantee that similar events would happen each semester. It also did not guarantee that all events would happen in-person. Further, the funds in the SERF Account were rolled over to the following year. Eddlemon points out that the funds in the five other SABRC accounts were not rolled over to the following year,

which he argues demonstrates that the University was unjustly enriched. However, there is no provision in the SABRC which requires the funds to be completely spent at the end of the semester. There is also no evidence that the University retained a benefit from its cancellation of student activities.

**\*6** Even if the University had retained a benefit, any reasonable jury would find that the University was discharged from its obligations due to frustration. Governor Pritzker's Executive orders prohibited any gathering of more than 10 people and closed all public places of amusement. (Doc. 43, Ex. 18). It also instructed that all non-essential business and operations must cease. (*Id.*). Because of the executive orders, the purported contract's purpose was frustrated and Eddlemon is not entitled to relief. *See Burt*, 84 F.4th at 58. Therefore, Defendant's Motion for Summary Judgment is granted as to the claims relating to the activity fees.

### 3. Course Surcharge

Finally, Eddlemon alleged that the University breached its contract as it relates to the course surcharge fee when it did not provide him access to the on-campus lab instruction, facilities, resources, or materials. The University argues that the course surcharge fees were expended in accordance with their historical use, and it does not require the fees to be exhausted during the semester in which they were charged.

The district court in *Omori v. Brandeis University*, 635 F.Supp.3d 47, 57 (D. Mass. Oct. 18, 2022), came to two different results when determining whether summary judgment was appropriate for certain fees. It held that mandatory fees described in general terms could not be recovered under plaintiffs' breach of contract claims, because there were no specific factual allegations in support of their subjective expectations that those fees were paid in consideration for in-person services or access to campus facilities. *Id.* To support this conclusion, the court relied on the holding of the D.C. Circuit Court that fees not tied "to the provision of on-campus services, activities, and programs" could not be recovered in plaintiffs' breach of contract claim. *Id., citing Shaffer v. George Washington University*, 27 F.4th 754, 767 (D.C. Cir. 2022). In contrast, the *Omori* court also

held held that studio fees, which were paid in connection with a studio arts class, survived summary Judgment. *Id.* This was because it was undisputed that the fee was specifically paid so that the students would have access to the studio, and it was "reasonable to infer that students who paid a Studio Fee for a particular course would have expected to receive in-person services in return." *Id.*

The parties agree that there is no express language in the course catalog or elsewhere as to the course surcharge fees. To support the existence of an implied contract, Eddlemon relies on the course descriptions, the schedule of classes, and his pre-pandemic activities in his classes. The schedule of classes for BIO 250 indicates that there is a $50 course surcharge, but, unlike other courses, it does not require students to enroll in a lab section. (Doc. 57, Ex. R). However, the class description indicates that it does have a laboratory. (Doc. 57, Ex. S). BIO 484 has a $150 course surcharge, and the laboratory component is optional according to both the schedule of classes and the course description. (Doc. 57, Exs. R, S). Based on this information, there is no indication that the course surcharge was relevant to Eddlemon's use of the laboratory. For example, a student could sign up for BIO 484 and forgo the laboratory option but would still be required to pay the same course surcharge. Based on these facts, the course surcharge fee is more akin to the general fees paid in *Omori* because there are no factual allegations to support Eddlemon's belief that his payment of the course surcharge fees permitted him to access the laboratory. Therefore, the University's Motion for Summary Judgment is granted as to the claims relating to the course surcharge fees.

## IV. CONCLUSION

**\*7** Accordingly, Bradley University's Motion for Summary Judgment (Doc. 43) is GRANTED. Plaintiff's Motion to Certify Class [83] is DISMISSED as moot. The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff.

## All Citations

Slip Copy, 2025 WL 978151

---

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.